UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

COMAU LLC,                                   Case No. 2:19-cv-12623-SFC-RSW

     Plaintiff,                             Honorable Sean F. Cox

v.                                           Magistrate Judge R. Steven Whalen

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

     Defendant.

---

## FIRST AMENDED COMPLAINT

Plaintiff, Comau LLC, formerly Comau, Inc. f/k/a Comau Pico, Inc. f/k/a Progressive Tool & Industries Company ("Comau"), by and through its counsel, Varnum LLP, hereby states for its First Amended Complaint against Defendant Blue Cross Blue Shield of Michigan ("BCBSM") as follows:

## NATURE OF ACTION

1.    Comau entrusted BCBSM to administer its self-insured employee benefit Plan.[1] Comau sent large sums of money to BCBSM, which BCBSM was supposed to use to pay employee health care claims. Comau recently learned that BCBSM grossly overpaid healthcare claims from healthcare providers.

---

[1] Comau LLC Health and Welfare Benefit Plan (formerly the health and welfare benefit plan of Comau Inc., f/k/a the Comau Pico, Inc. health and welfare benefit plan, f/k/a the Progressive Tool & Industries Company health and welfare benefit plan) (hereafter referred to as the "Plan").

BCBSM's mismanagement of Plan Assets clearly constitutes a breach of BCBSM's fiduciary duty of care under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Plaintiff brings this suit to recover the misappropriated funds and obtain all other relief to which they are entitled.

## PARTIES, JURISDICTION AND VENUE

2.      Comau is a Delaware limited liability company, with its principal location in Southfield, Michigan.

3.      Blue Cross Blue Shield of Michigan ("BCBSM") is a Michigan non-profit health care corporation organized under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq* (the "Act").

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 because Plaintiff's claims arise under ERISA.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan.  Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2).

## GENERAL ALLEGATIONS

6.      Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs.

7.     In 2000, Comau North America, Inc. merged with Progressive Tool & Industries Company, with the surviving entity being Progressive Tool & Industries Company.  Progressive Tool & Industries Company subsequently changed its name to Comau Pico, Inc., which then changed to Comau, Inc.  On January 1, 2015, Comau, Inc. converted into Comau LLC.  From hereafter, these entities are collectively referred to as "Comau."

8.     Comau develops and produces process automation, manufacturing and service products.

9.     Comau offers health care benefits through the Plan.  Rather than buy health insurance to cover employee health care claims under the Plan, during the relevant time period Comau has opted to self-insure.  As such, Comau paid the actual employee health care costs covered by the Plan, up to a large threshold. Comau bought "stop loss" insurance to cover claims that exceeded that threshold.

A.     THE BEGINNING OF THIS DISPUTE.

10.     This dispute stems from Comau's long relationship with BCBSM.  A relationship that has been fraught with deception and fraud.

11.      Years ago, BCBSM began providing administrative services to Comau and Comau's self-funded health benefits Plan.

12.     A self-funded arrangement is one in which the company (Comau in this case) self-insures the healthcare claims of its employees instead of buying an

insurance policy. Generally speaking, for every dollar of claims incurred by an employee, the self-funded entity pays that dollar. In order to self-fund, the company contracts with an administrator to process and pay the claims in exchange for a disclosed fee.

**B.** **BCBSM FUNCTIONED, AND CONTINUES TO FUNCTION, AS A FIDUCIARY TO THE PLAN BECAUSE COMAU PROVIDED BCBSM WITH PLAN ASSETS, WHICH WERE CONTROLLED BY BCBSM TO BE USED TO PAY COVERED EMPLOYEE CLAIMS.**

13. The framework for the relationship between Comau and BCBSM was that BCBSM agreed to administer the Plan by paying covered employee health care claims on behalf of the Plan, using money provided to it by Comau.

14. In essence, BCBSM would process and pay claims on behalf of Comau using Comau Plan's assets.

15. In exchange for its services, BCBSM receives an administrative fee, for which Comau receives weekly invoices.

16. Comau sent the required prepayments to a BCBSM-owned bank account, on a periodic basis, in order for BCBSM to pay claims on Comau's behalf.

17. The prepayments sent to BCBSM's bank account were "Plan Assets" as defined by ERISA. *See* Findings of Fact & Conclusions of Law in *Hi-Lex Controls, Inc., v. BCBSM*, No. 11-cv-12557, 2013 WL 3773364 (E.D. Mich. July 17, 2013), and *aff'd sub nom. Hi-Lex Controls, Inc. v. BCBSM*, 751 F.3d 740 (6th Cir. 2014), (the "*Hi-Lex* FFCL") at ¶¶ 5, 6, & 180; *Hi-Lex,* 751 F.3d at 745-46.

4

18.    BCBSM had complete authority and control over the bank account and the Plan Assets sent to it by Comau.

19.    BCBSM (1) exercised discretionary authority and control with respect to management of the Plan; (2) exercised authority and control with respect to management and disposition of Plan Assets; or (3) had discretionary authority and responsibility in the administration of the Plan.  *Hi-Lex* FFCL, at ¶¶ 180-82; *Hi-Lex*, 751 F.3d at 744-47.

20.    The Sixth Circuit already held that BCBSM functioned as a fiduciary in its administration of other similarly situated self-funded plans.  *See* 751 F.3d at 747 ("common law supports the conclusion that BCBSM was holding the funds wired by Hi–Lex 'in trust' for the purpose of paying plan beneficiaries' health claims and administrative costs. Accordingly, the district court did not err in finding that BCBSM held plan assets of the Hi–Lex Health Plan and, in doing so, functioned as an ERISA fiduciary.").

## C.    BCBSM'S HIDDEN FEES SCHEME.

21.    Starting in 1993, BCBSM implemented a scheme to secretly obtain more administrative compensation than it was entitled.

22.    BCBSM's scheme was simple; it marked up hospital claims by as much as 20% and then passed (without disclosing it) the charge onto Comau and its other customers.  *Hi-Lex Controls, Inc. v. BCBSM*, 751 F3d 740, 743 (6th Cir

5

2014).  BCBSM kept the additional amount as hidden administrative compensation ("Hidden Fees"):

| | |
|---|---|
| Actual Claim Paid to Hospital: | $6,000 |
| Add-On For Hidden Fees Kept by BCBSM: | $810 |
| Hospital Claim Reported to Plaintiff: | $6,810 |

23.     But BCBSM did not stop there.  It also shifted the cost associated with maintaining its network (internally known as "Network Access Fee") to the Hidden Fees.  *See Hi-Lex* FFCL at ¶ 25.

24.     This allowed BCBSM to lower its disclosed administrative fee, giving the illusion that it was more cost competitive, without actually giving up any revenue.

25.     BCBSM went to great lengths to conceal this scheme from Comau and other customers.

26.     For one, BCBSM sent false documents to its customers, including inaccurate quarterly settlements and annual settlements.

27.     The quarterly reports contained details about a plan's performance. However, the quarterly reports did not show the amount – or even the existence – of the Hidden Fees.  *Hi-Lex* FFCL, at ¶¶ 40-44.

28.     The annual reports also included a section entitled "Administrative Fee Settlement," which was supposed to disclose BCBSM's compensation;

however, BCBSM did not include the Hidden Fees in that section either. *See Hi-Lex* FFCL, at ¶ 62.

29.  BCBSM also sent customers "Form 5500 information" documents, which expressly stated that certain subsidies and surcharges were not being paid, even though the customer was paying them through inclusion in the marked-up hospital claims.

30.  *Hi-Lex Controls, Inc., v. BCBSM*, No. 11-cv-12557 (E.D. Mich.), was the first Hidden Fees case to proceed through trial.  Following a nine day bench trial in the *Hi-Lex* case, the Honorable Victoria A. Roberts issued Findings of Fact and Conclusions of Law that were sixty-three pages long (the "*Hi-Lex* FFCL"), awarding the *Hi-Lex* plaintiffs 100% of the claimed Hidden Fees, pre-judgment interest back to 1994, and attorneys' fees.

31.  This Court concluded that "BCBSM violated ERISA's prohibition against self-dealing and also breached its fiduciary duties.  It also engaged in fraud and concealment to hide its violations from Plaintiffs." *Hi-Lex* FFCL, at ¶ 256.

32.  While *Hi-Lex* was the first Hidden Fees case to go to trial, it was not the first such case in this Court.  The original Hidden Fees case is *Pipefitters Local 636 Insurance Fund v. BCBSM*, No. 04-73400 (E.D. Mich.), which was filed on September 1, 2004.  On July 18, 2013, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Pipefitters* holding that BCBSM was an ERISA

fiduciary and that BCBSM violated ERISA by charging Hidden Fees to its self-insured, ASC customers.  *Pipefitters Local 636 Ins. Fund v. BCBSM*, 654 F.3d 618 (6th Cir. 2011).

33.    Following the decision in *Pipefitters*, on May 14, 2014, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Hi-Lex*, affirming this Court's decision.  *Hi-Lex*, 751 F.3d 740, *cert. denied* 135 S.Ct. 404 (Oct. 20, 2014).

34.    The Sixth Circuit declared "BCBSM committed fraud by knowingly misrepresenting and omitting information about the Disputed Fees in contract documents."  *Id.* at 748.  The Court further affirmed that "BCBSM also 'engaged in a course of conduct designed to conceal evidence of [its] alleged wrong-doing.'" *Id.* at 749 (quoting *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994)).

35.    In 2016, Comau brought its own Hidden Fees Case against BCBSM, in *Comau LLC and Comau LLC Health and Welfare Benefit Plan v. BCBSM*, No. 16-cv-12870 (ED Mich 2016), which eventually settled outside of court.

## D.    The Current Dispute: BCBSM Mismanages Plan Assets By Willingly Paying Healthcare Providers' Improper Claims

36.    After resolution of the Hidden Fees case, Plaintiff hoped it had resolved all issues with BCBSM.

37.    To Plaintiff's shock and disappointment, it learned that BCBSM's lack of care for its customers did not end with the Hidden Fees scheme.

38.    Plaintiff recently learned that since at least 1997, BCBSM has been paying grossly inflated healthcare claims from health care providers ("Providers").

39.    As an example: a Comau employee (an Enrollee/Plan beneficiary) receives a routine urinalysis from a Provider, such as a rehab center.  That Provider then bills BCBSM for the routine urinalysis.  The Provider charges $18,000 (an outrageous fee) for a routine urinalysis that actually costs $10.00 or less.  In its discretion as a Plan fiduciary, BCBSM then uses Plan Assets to pay the grossly inflated Provider's bill.

40.    BCBSM knows how grossly inflated the Provider's bill is, but willingly pays the improper claims anyway.  After all, the money is not BCBSM's, so paying inflated bills costs BCBSM nothing, and to contest a bill would require using BCBSM's resources.

41.    These improper claims from Providers are well-known in the health care industry, and have continuously been reported about.

42.    Some authorities have reported that from 2011 to 2014 these improper claims were on the rise, quadrupling spending on urine testing and other related tests.  *See HEALTHCARE FINANCE* November 6, 2017 article, attached as **Exhibit A**.

9

43.     For instance, Blue Cross Blue Shield of Texas refused to cover such improper claims. After receiving a claim for a $17,850 lab test, which Blue Cross Blue Shield of Texas believed was reasonably valued at $100.92, Blue Cross Blue Shield of Texas denied the claim and diligently informed its customer that the lab testing work was outrageously priced. *See* NPR February 16, 2018 article, attached as **Exhibit B**.

44.     Unlike Blue Cross Blue Shield of Texas, BCBSM was not concerned with its customers' well-being.

**E.     Dennis Wegner Reviews Comau's Records And Confirms BCBSM Mismanaged Comau's Plan Assets By Willingly Paying Healthcare Providers' Improper Claims**

45.     BCBSM's payment of Providers' improper claims recently came to light when BCBSM's account manager of 18 years, Dennis Wegner ("Mr. Wegner"), blew the whistle.

46.     During his employment at BCBSM, Mr. Wegner was an account manager for many BCBSM customers, including Comau.

47.     As account manager, he had access to each customer's records, billing, accounting, and healthcare claims information.

48.     Mr. Wegner also had access to BCBSM's healthcare claims processing system, software, and billing system, which were used universally on all customer accounts.

49.    As an account manager, Mr. Wegner was alerted by a BCBSM customer about a significant medical claim the customer received, in excess of $250,000.

50.    Mr. Wegner investigated the customer's complaint and discovered that BCBSM was grossly overpaying the Provider for routine medical testing.

51.    In that particular customer's case, BCBSM had overpaid Providers more than $600,000 within a two year period.

52.    Mr. Wegner brought the issue to BCBSM's attention, and to Mr. Wegner's surprise BCBSM's management confirmed that BCBSM's payment of the Providers' improper claims are known to happen in the BCBSM billing system, but BCBSM has done nothing to stop them.

53.    Alarmed that BCBSM's payment of improper claims may not be isolated to one customer, Mr. Wegner researched claims and billings for two other BCBSM customers and found similar overpayments, totaling $125,000 in one case, and $75,000 in another case.

54.    BCBSM's systems are organized in a way that guarantees Comau was also impacted by BCBSM's overpayment of Provider's improper claims.

55.    BCBSM's healthcare claims processing, billing, and accounting systems are applied universally to all of its customers ("BCBSM's Systems").

56.     BCBSM's Systems utilize the same technology and software to process, bill, and pay all client healthcare claims.

57.     Because Comau was a BCBSM customer its healthcare claims would have been processed, billed, and paid using the same BCBSM Systems.

58.     As a result, the very same system failures that gave rise to other overpayment also subjected Comau to the very same issues.

59.     Mr. Wegner has personal knowledge that Comau was affected by BCBSM's payment of improper claims.

60.     Mr. Wegner was the account manager for Comau's account at BCBSM.

61.     As Comau's account manager, Mr. Wegner had access to all of Comau's records, billing, accounting, and healthcare claims information.

62.     Mr. Wegner has confirmed to Comau, based on his personal knowledge of BCBSM's records, that Comau was overcharged by BCBSM as set forth above.

63.     Based on personal knowledge of Comau's data at BCBSM, Mr. Wegner has confirmed that BCBSM has paid many improper claims using Comau's Plan's Assets to Providers.  These grossly inflated claims have cost Comau many thousands of dollars in overpayments.

64. Mr. Wegner brought his concerns about overpayments to BCBSM's attention, but was told to cease researching the issue, to "stand down," and to refrain from alerting any BCBSM customers of Providers' improper claims paid by BCBSM.

65. He similarly expressed his concern about BCBSM's payment of Providers' improper claims to his supervisor at BCBSM, David Malik.

66. The improper claims were known by many key employees and executives within BCBSM, including Rod Begosa, Lori Shannon, Gary Gavin, and Ken Dallafior. Yet no one at BCBSM took any action to stop the payment of improper claims.

67. Instead of embracing Mr. Wegner's concern and notifying Plaintiff of Providers' improper claims BCBSM paid, BCBSM's management began treating Mr. Wegner poorly and it became evident that he was being punished for his unwillingness to remain quiet.

68. On November 14, 2018, BCBSM terminated Mr. Wegner's employment.

69. On February 5, 2019, Mr. Wegner filed a lawsuit against BCBSM, alleging violations of the Michigan Whistleblowers' Protection Act and Michigan Bullard-Plawecki Employee Right-to-Know-Act. *See Dennis Wegner v BCBSM*, No 19-001808-CD (Wayne Cnty. Cir. Ct.), attached as **Exhibit C**.

13

70.     BCBSM's practice of knowingly paying Providers' improper claims is widespread and would cost BCBSM millions of dollars to correct.

71.     Though widespread, Plaintiff was left in the dark by BCBSM, Plaintiff had no knowledge of BCBSM's payment of improper claims, until Mr. Wegner filed a lawsuit.

72.     Before then, Plan Assets were recklessly paid by BCBSM to Providers.

**F.     BCBSM'S PRACTICE OF WILLINGLY PAYING IMPROPER CLAIMS IS INCONSISTENT WITH INDUSTRY STANDARDS, INCONSISTENT WITH HOW BCBSM HOLDS ITSELF OUT TO THE PUBLIC, AND INCONSISTENT WITH REPRESENTATIONS IT MAKES TO CUSTOMERS.**

73.     BCBSM's practice of paying Providers' improper claims is contrary to standards and norms in the health insurance industry, contrary to how BCBSM markets itself to the public, and is contrary to representations it makes to customers.

74.     The health insurance industry has standards and norms for evaluating improper claims payments.

75.     Improper payments include a payment for an incorrect amount (including overpayments and underpayments), a payment to an ineligible provider, double billing, payment for services not received, and payment for noncovered services.  Providers submitting claims such as these are considered to be fraudulent.

14

76.     BCBSM's payment of claims it knows to be improper is inconsistent with these health insurance industry standards.

77.     BCBSM's payment of improper Providers' claims is also utterly inconsistent with the way BCBSM holds itself out to the public.

78.     BCBSM's own website warns the public about the dangers of health care fraud.  *See* **Exhibit D**; https://www.bcbsm.com/health-care-fraud/index.html.

79.     BCBSM's website also states that a common example of health care fraud is "[b]illing for more expensive services or procedures that were actually provided." *Id.*

80.     Further, BCBSM's website warns that the consequences of fraud include "[i]ncreasing insurance costs for everyone." *See* **Exhibit E**; https://www.bcbsm.com/index/health-insurance-help/faqs/topics/other-topics/how-to-recognize-and-report-health-care-fraud.html.

81.     However, BCBSM goes much further than simply explaining the dangers of health care fraud.  BCBSM holds itself out as an expert in preventing such fraud.   *See* **Exhibit F**; https://www.bcbsm.com/health-care-fraud/fighting-fraud.html.

82.     With supposed expertise in fraud prevention, BCBSM represents that: "[m]embers of [its] investigative staff use a combination of talents in order to uncover fraud.   They have experience in complex financial investigations,

interview and interrogation, check and credit card fraud, narcotics, organized crime, surveillance, undercover operations, consumer fraud and police administration. The remainder has expertise in the areas of benefits, claims processing, auditing, accounting and finance, technology and security." *Id.*

83. BCBSM represents that it works with "local, state and federal authorities to bring people who commit health care fraud to justice." *Id.* Also, BCBSM claims it has recovered "more than $333 million" through its Corporate and Financial Investigations Unit since 1980. *Id.*

84. However, BCBSM's payment of Providers' improper claims is in complete contravention to its supposed concern, diligence, and reputation for preventing fraud.

85. BCBSM's payment of Providers' improper claims is inconsistent with the representations it makes to its own customers.

86. Comau never imagined, nor had reason to imagine based on BCBSM's own representations, that BCBSM knowingly paid Providers' improper claims.

87. Furthermore, Comau did not only rely on BCBSM's own representations, but it also relied on the information BCBSM provided to Comau.

88. The limited reporting information BCBSM provided to Comau contained no information about BCBSM's practice of paying Providers' improper claims.

89.     Therefore, based on BCBSM's own representations – that BCBSM is as an industry expert in fraud prevention – and the fact that information BCBSM provided Comau contained no information about its practice of paying Providers' improper claims, Comau trusted and believed that BCBSM was acting Comau's best interest. As explained above, Comau was wrong.

<u>COUNT I</u>
<u>BREACH OF FIDUCIARY DUTY – ERISA</u>

90.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs.

91.     BCBSM was a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) with respect to the Plan because (1) it exercised discretionary authority and control over management of the Plan; (2) it exercised authority and control over management and disposition of Plan Assets (*Hi-Lex* FFCL, at ¶ 182; *Hi-Lex*, 751 F.3d at 744-47); or (3) it had discretionary authority and responsibility in the administration of the Plan.

92.     Comau is a fiduciary because it exercised discretionary authority and control over management of the Plan.

93.     As a fiduciary, BCBSM was required, among other things, to discharge its duties solely in the interest of the employees and beneficiaries of the Plan, preserve Plan Assets, fully disclose its actions, avoid making false or

misleading statements, and abide by any statutory obligations or restrictions imposed on it.

94.    BCBSM breached its fiduciary duties in numerous ways, including, but not limited to:

(a)    Intentionally and knowingly paying grossly inflated and knowingly inflated healthcare claims to Providers;

(b)    Failing to correct/update its Billing System to avoid Plan assets being used to pay improper charges and concealing from, and otherwise failing to disclose to, Plaintiff the payment of improper claims;

(c)    Failing to exercise the care, skill, prudence, and diligence under the circumstances that a prudent fiduciary acting in a like capacity and familiar with such matters would use in paying for healthcare claims;

95.    BCBSM's breach of its fiduciary duty has proximately caused substantial damages to Plaintiff.

96.    Plaintiff did not discover the full extent of BCBSM's wrongful conduct until learning of Mr. Wegner's lawsuit.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment in their favor and against BCBSM as follows:

A.    Ordering BCBSM to provide a full and complete accounting of all payments to Providers it made on Plaintiff's behalf using Plan Assets;

B.   Declaring that BCBSM breached its fiduciary duty and otherwise violated federal law by (1) grossly mismanaging the Plan's Assets, (2) not exercising the care, skill, prudence, and diligence under the circumstances that a prudent fiduciary acting in a like capacity and familiar with the such matters would use in paying for healthcare claims, (3) not making decisions, regarding Plan Assets, with an eye single to the interests of the participants and beneficiaries, and (4) failing to disclose its payment of improper claims;

C.   Awarding restitution to Plaintiff for all inflated healthcare payments to Providers;

D.   Awarding monetary damages, costs, interest, disgorgement of BCBSM's profits, and attorneys' fees (including statutory attorneys' fees under ERISA) to the fullest extent of the law; and

E.   Awarding all other relief to which Plaintiff may be entitled.

VARNUM LLP
Attorneys for Plaintiff


Date: December 13, 2019          By:   /s/ Aaron M. Phelps
                                 Aaron M. Phelps (P64790)
                          Business Address & Telephone:
                                 Bridgewater Place, PO Box 352
                                 Grand Rapids, MI, 49501-0352
                                 Phone: (616) 336-6000
                                 Fax: (616) 336-7000
                                 amphelps@varnumlaw.com

19

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 13, 2019, I caused to be served a true an correct copy of the foregoing, via the Court's CM/ECF system, upon all counsel of record.

*/s/ Maryanne Poll*
Maryanne Poll

15724706_2.doc