## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| COMAU LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:19-cv-12623-SFC-RSW |
| | ) | |
| v. | ) | |
| | ) | Judge Sean F. Cox |
| BLUE CROSS BLUE SHIELD OF | ) | |
| MICHIGAN, | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), through its undersigned counsel, hereby moves, pursuant to Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6), to dismiss the First Amended Complaint (ECF No. 15). BCBSM respectfully requests that the Court grant this Motion for the reasons set forth in the accompanying brief.

Pursuant to Rule 26(c) and Local Civil Rule 7.1(a), BCBSM's counsel, Kathleen L. Carlson, in good faith sought concurrence in the relief requested in this motion from counsel for Plaintiff Comau LLC ("Comau") during a telephonic meeting on January 14, 2020. Comau's counsel opposed the requested relief.

Dated: January 15, 2020

G. Christopher Bernard (P57939)
Maria L. Martinez (P78790)
Blue Cross Blue Shield of Michigan
600 East Lafayette Boulevard
Detroit, MI 48226
Telephone: (313) 225-6541
CBernard@bcbsm.com
MMartinez3@bcbsm.com

Respectfully submitted,

/s/Kathleen L. Carlson
Thomas D. Cunningham
Tacy F. Flint
Kathleen L. Carlson
Benjamin I. Friedman
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
tcunningham@sidley.com
tflint@sidley.com
kathleen.carlson@sidley.com
benjamin.friedman@sidley.com

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| COMAU LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:19-cv-12623-SFC-RSW |
| | ) | |
| v. | ) | |
| | ) | Judge Sean F. Cox |
| BLUE CROSS BLUE SHIELD OF | ) | |
| MICHIGAN, | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF
## ITS MOTION TO DISMISS PLAINTIFF'S FIRST
## <u>AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM</u>

# **TABLE OF CONTENTS**

ISSUES PRESENTED.................................................................................v

CONTROLLING AND/OR MOST APPROPRIATE AUTHORITY .................. vii

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................4

    I.     The Parties....................................................................4

    II.    The AC ........................................................................6

ARGUMENT ......................................................................................10

    I.     The AC Fails To Allege Fraud With Particularity...............11

         A.    Rule 9(b) Governs Comau's Claim. .........................11

         B.    The AC Does Not Satisfy Rule 9(b)'s "Strict" Pleading
              Standard. ..................................................14

         C.    At A Minimum, The Court Must Disregard The Allegations
              Of Fraud That Are Inadequately Pled Under Rule 9(b),
              Which Is Also Fatal To The AC. .............................19

    II.    The AC Fails To State A Claim For Breach Of Fiduciary Duty. .......20

    III.   The Claims Based On Payments Made More Than Six Years
         Before The Filing Of This Action Are Untimely................................24

CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. *passim*

*Bocanegra v. Stacey*,
    No. 10-cv-13749, 2011 WL 4448979 (E.D. Mich. Sept. 26, 2011) ..................... 8

*Cataldo v. U.S. Steel Corp.*,
    676 F.3d 542 (6th Cir. 2012) ............................................................ v, vii, 11, 12

*Chesbrough v. VPA, P.C.*,
    655 F.3d 461 (6th Cir. 2011) ...................................................................... vii, 15

*Chicago Dist. Council of Carpenters Welfare Fund v. Angulo*,
    169 F. Supp. 2d 880 (N.D. Ill. 2001) .................................................................. 13

*Crocker v. KV Pharm. Co.*,
    782 F. Supp. 2d 760 (E.D. Mo. 2010) ......................................................... vii, 13

*DeBruyne v. Equitable Life Assurance Soc'y of U.S.*,
    920 F.2d 457 (7th Cir. 1990) ............................................................................. 22

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ........................................................................... vii, 10, 20

*Hennigan v. Gen. Elec. Co.*,
    No. 09-11912, 2010 WL 3905770 (E.D. Mich. Sept. 29, 2010) ............ 12, 13, 14

*Hi-Lex Controls, Inc. v. BCBSM*,
    751 F.3d 740 (6th Cir. 2014) .............................................................................. 7

*In re Calpine Corp. ERISA Litig.*,
    No. C 03-1685, 2005 WL 3288469 (N.D. Cal. Dec. 5, 2005) ........................... 13

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ............................................................... 8

*In re Gen. Motors ERISA Litig.*,
    No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006) .......... vii, 12, 19, 20

*Larson v. Northrop Corp.*,
  21 F.3d 1164 (D.C. Cir. 1994) ............................................................................24

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ..............................................................................23

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ..............................................................................11

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs.*
  *Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ........................................................................*passim*

*Pipefitters Local 636 Insurance Fund v. BCBSM*,
  654 F.3d 618 (6th Cir. 2011) ................................................................................7

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*,
  No. 5:18-cv-06037, 2019 WL 302515 (W.D. Mo. Jan. 23, 2019) ......................5

*Rodic v. Thistledown Racing Club, Inc.*,
  615 F.2d 736 (6th Cir. 1980) ................................................................................8

*Sanderson v. HCA-The Healthcare Co.*,
  447 F.3d 873 (6th Cir. 2006) ..............................................................11, 15, 17

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
  501 F.3d 493 (6th Cir. 2007) ......................................................................*passim*

*U.S. ex rel. Hockenberry v. Ohio Health Corp.*,
  No. 2:15-CV-666, 2016 WL 4480350 (S.D. Ohio Aug. 25, 2016),
  *aff'd*, 2017 WL 4312016 (6th Cir. Apr. 14, 2017) .............................................17

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*,
  532 F.3d 496 (6th Cir. 2008) .............................................................. vii, 12, 18

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*,
  618 F.3d 505 (6th Cir. 2010) ....................................................................... vii, 16

*Urban v. Comcast Corp.*,
  Civ. A. No. 08-773, 2008 WL 4739519 (E.D. Pa. Oct. 28, 2008) ....................13

*Vess v. Ciba–Geiby Corp. U.S.A.*,
  317 F.3d 1097 (9th Cir. 2003) ............................................................................13

iii

*Vigeant v. Meek*,
   352 F. Supp. 3d 890 (D. Minn. 2018), *appeal docketed*, No. 18-
   3616 (8th Cir. Dec. 10, 2018) ............................................................12

*Vivien v. Worldcom, Inc.*,
   No. C 02-01329, 2002 WL 31640557 (N.D. Cal. July 26, 2002) ......................13

## Statutes

29 U.S.C. § 1104(a)(1)(B) ...............................................................v, 20, 23

29 U.S.C. § 1113(1)(A)......................................................................24, 25

29 U.S.C. § 1113(2) .......................................................................v, 24

## Other Authorities

Federal Rule of Civil Procedure 9(b)................................................*passim*

Federal Rule of Civil Procedure 8(a) .............................................2, 3, 20

Federa Rule of Civil Procedure 12(b)(6) ...............................................24

iv

## <u>ISSUES PRESENTED</u>

1.     Plaintiff Comau LLC's ("Comau") claim "sounds in fraud" but fails to allege "the time, place, and content of the alleged misrepresentation[s]," as required by Federal Rule of Civil Procedure 9(b). *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012). Should the Court dismiss the Amended Complaint ("AC") because it does not allege fraud with the required particularity?

BCBSM answers YES.

2.     The AC alleges that Blue Cross Blue Shield of Michigan ("BCBSM") has a process for detecting fraudulent claims, but does not identify a single improperly paid claim, let alone one improperly paid on behalf of Comau's self-insured healthcare plan (the "Plan"). Nor does it allege any facts as to how BCBSM's process deviates from that of a prudent claims administrator. Should the Court dismiss the AC because it does not plausibly allege that BCBSM failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), in processing and paying claims on behalf of the Plan?

BCBSM answers YES.

3.     Based on the allegations in the AC, the statute of limitations for claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1113(1), requires that such claims be pled within six years. Should Comau's claims be dismissed as untimely to the extent they are based on BCBSM's payment of claims

on the Plan's behalf more than six years before the original complaint was filed—

i.e., before September 6, 2013?

 BCBSM answers YES.

## <u>CONTROLLING AND/OR MOST APPROPRIATE AUTHORITY</u>

*Fifth Third Bancorp v. Dudenhoeffer*,
 573 U.S. 409 (2014)

*Cataldo v. U.S. Steel Corp.*,
 676 F.3d 542 (6th Cir. 2012)

*Chesbrough v. VPA, P.C.*,
 655 F.3d 461 (6th Cir. 2011)

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*,
 532 F.3d 496 (6th Cir. 2008) ("*SNAPP I*")

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*,
 618 F.3d 505 (6th Cir. 2010) ("*SNAPP II*")

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*,
 501 F.3d 493 (6th Cir. 2007)

*Crocker v. KV Pharmaceutical Co.*,
 782 F. Supp. 2d 760 (E.D. Mo. 2010)

*In re General Motors ERISA Litigation*,
 No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006)

**INTRODUCTION**

In response to Blue Cross Blue Shield of Michigan's ("BCBSM") motion to dismiss Plaintiff Comau LLC's ("Comau") original complaint, this Court gave Comau a chance to fix the defects BCBSM's motion identified. In response, Comau filed the First Amended Complaint (the "AC"). The AC includes a handful of new allegations, but has the same fundamental flaw as the original complaint: Comau has not identified a single instance of BCBSM allegedly using assets from Comau's ERISA-governed healthcare plan (the "Plan") to pay fraudulent or improper healthcare claims. Comau instead asks this Court to *speculate* that BCBSM made such payments because a purported whistleblower identified supposedly improper payments that BCBSM allegedly made on behalf of three *other* customers. It then asks this Court to take the further leap of concluding that BCBSM's entire fraud-detection process fails to satisfy the duty of prudence, even though Comau alleges no facts concerning how BCBSM's fraud-detection process functions or how a prudent process would function. These allegations are insufficient to state a claim for two reasons.

*First*, the AC is subject to Rule 9(b)'s "strict" pleading standard. Comau's theory is that BCBSM "[i]ntentionally and knowingly pa[id] grossly inflated and knowingly inflated healthcare claims" using the Plan's assets and "conceal[ed]" from Plaintiff its payment of these "improper claims." AC ¶ 94(a)-(b). In an apparent

1

attempt to evade Rule 9(b), Comau in the AC substituted the word "improper" or "inflated" where it had previously expressly alleged fraud, but this wording change makes no difference. Indeed, even the AC makes clear that such "improper" claims "are considered to be fraudulent." AC ¶ 75. Because the AC "sounds in fraud," Comau must plead its claim "with particularity" under Rule 9(b).

An "indispensable element" of pleading a claim under Rule 9(b) is alleging the specifics of a fraudulent claim, which ensures that the defendant has sufficient information to defend itself. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (attached to the Declaration of Kathleen L. Carlson ("Carlson Decl.") as Ex. 1). But Comau does not identify a single payment—whether fraudulent or not—made on behalf of the Plan, let alone the "who, what, when, where, and how" of such a payment. Without this information, BCBSM cannot discern which of the many payments over the parties' decades-long relationship are at issue, it cannot investigate any alleged improper payments; and it cannot assess whether the payments were proper or not. The AC should therefore be dismissed for failure to satisfy Rule 9(b).

*Second*, the AC fails to state a claim that BCBSM's fraud-detection systems are imprudent, even under Rule 8's more lenient pleading standard. The AC contends that BCBSM breached its duty of prudence under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1104(a)(1)(B) ("ERISA"), by paying

fraudulent or improper medical claims. To state a claim, the AC must "plausibly" allege that BCBSM's process for identifying fraudulent or improper healthcare claims is flawed. *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717-18 (2d Cir. 2013). The AC does not allege *any* facts related to BCBSM's process for detecting improper claims—let alone allege any facts related to any improper payment BCBSM is supposed to have made under that system using Comau's Plan's assets. Indeed, contrary to alleging any flaw in BCBSM's fraud detection process, Comau alleges that BCBSM has personnel and procedures in place to uncover fraud and that this process has been effective, resulting in the successful recovery of $333 million. AC ¶¶ 81-83, Ex. F.

The AC nevertheless suggests that this process *may* have been ineffective in a few instances, alleging that BCBSM paid fraudulent claims on behalf of three *other* customers—but not the Plan. Comau then tries to tie these allegations to its own Plan by alleging that BCBSM uses the same "software" to process and pay claims for all of its customers. AC ¶ 56. These allegations, however, without further factual enhancement stop short of crossing the line from possible to plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The AC therefore fails to state a claim under Rule 8.

Finally, if the Court does not dismiss the AC entirely, the statute of limitations

bars Comau's claim to the extent it is based on healthcare claims paid more than six years before the date of the original complaint—i.e., before September 6, 2013.

## BACKGROUND[1]

### I.      The Parties

*Comau.* Comau is the sponsor of a self-insured employee benefit plan, called the Comau LLC Health and Welfare Benefit Plan. AC ¶ 1 n.1. Rather than purchase a group health insurance plan from an insurer, the sponsor of a self-insured benefit plan pays the actual employee healthcare costs covered by the plan directly. AC ¶ 9. Because plan sponsors generally lack a network of healthcare providers and claims processing capabilities, self-insured plans ordinarily contract with a third-party to process and pay employees' healthcare claims and access its provider network. AC ¶ 12. Comau contracted with BCBSM, a claims administrator, for this purpose. AC ¶¶ 10-11.

*BCBSM.* BCBSM is a Michigan non-profit mutual insurance company.[2] BCBSM offers claims administration under administrative services contracts to self-funded plans like Comau's—and also offers fully insured coverage to employer

---

[1] Solely for purposes of this motion, BCBSM accepts as true the factual allegations in the AC. *Twombly*, 550 U.S. at 555.

[2] The AC alleges (¶ 3) that BCBSM is organized under the Nonprofit Health Care Corporation Reform Act, MCL § 550.1101 ("PA 350"), but BCBSM has not been subject to PA 350 since it became a non-profit mutual insurance company in 2014.

plans, in which BCBSM is responsible for payment of plan beneficiaries' claims. AC ¶ 9. Because it routinely pays medical claims, BCBSM has a strong interest in reducing medical fraud. In 1980, BCBSM became the first insurer in the United States to launch a dedicated healthcare fraud investigations unit, which is known as the Corporate and Financial Investigations Unit ("CFI"). AC, Ex. F. CFI members are highly trained and have "experience in complex financial investigations, interview and interrogation, check and credit card fraud, narcotics, organized crime, surveillance, undercover operations, consumer fraud and police administration." *Id.*; *see also* AC ¶ 82. Among other things, CFI investigates tips that are reported through BCBSM's Fraud Hotline, and coordinates with state and federal law enforcement to "bring people who commit health care fraud to justice." AC, Ex. F.

Since May 2008, BCBSM has also used advanced software to identify "abnormal billing patterns by doctors and facilities" and "find[] higher-than-normal prescription drug purchases by members," which has "launch[ed] a number of fraud investigations that resulted in criminal prosecutions and arrest warrants." AC, Ex. F. When potential healthcare fraud is identified, BCBSM refers suspected wrongdoers to law enforcement for criminal prosecution and sues the wrongdoers civilly to recover losses. *See, e.g., RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 5:18-cv-06037, 2019 WL 302515 (W.D. Mo. Jan. 23, 2019). The combination of a highly trained investigative unit and state-of-the-art technology has allowed

5

BCBSM to recover millions of dollars and resulted in thousands of criminal convictions. Indeed, since 1980, CFI has recovered more than $333 million. AC, Ex. F; *see also* AC ¶ 83.

## II.  <u>The AC</u>

As shown in the attached comparison (attached to the Carlson Decl. as Ex. 2), the AC is strikingly similar to the original complaint filed by Comau. Indeed, the AC re-alleges more than 70 paragraphs from the original complaint with little or no modification. *See* AC ¶¶ 1-38, 40-44, 49-53, 64-70, 76-85, 88-93, 95-96. And the AC continues to allege that the relationship between BCBSM and Comau "has been fraught with deception and fraud." AC ¶ 10. Thus, while Comau has stricken the word "fraud" or its variant from 17 paragraphs in the AC, instead substituting the words "improper" or "grossly inflated,"[3] the AC continues to allege that improper or inflated "claims . . . are considered to be fraudulent." AC ¶ 75. The AC's theory of breach is therefore the same as the original complaint's: BCBSM purportedly breached its fiduciary duties to Comau by "[i]ntentionally and knowingly paying grossly inflated and knowingly inflated healthcare claims"—which "are considered to be fraudulent"—and "concealing from, and otherwise failing to disclose to, Plaintiff" those allegedly fraudulent payments. AC ¶¶ 75, 94(a)-(b). But just like the

---

[3] *Compare* Compl. ¶¶ 38, 40, 50-53, 55-56, 59, 60, 63-64, 71-75, 80(a)-(b) *with* AC ¶¶ 38, 40, 41, 42, 43, 52, 53, 54, 64, 66, 67, 59, 60, 74, 76, 77, 94(a)-(b).

original complaint, the AC fails to identify any fraudulent payments made using the Plan's assets or allege any facts to plausibly suggest that such fraudulent payments occurred. And just like the original complaint, the AC attempts to state a claim by stringing together two events that have nothing to do with BCBSM's payment of healthcare claims for the Plan.

***Access Fees.*** First, the AC devotes several pages to earlier, unrelated litigation about BCBSM's collection of allegedly undisclosed administrative fees ("access fees"). AC ¶¶ 21-35. Comau pointed to two long-since-resolved cases—*Hi-Lex Controls, Inc. v. BCBSM*, 751 F.3d 740 (6th Cir. 2014), and *Pipefitters Local 636 Insurance Fund v. BCBSM*, 654 F.3d 618 (6th Cir. 2011)—that did not involve Comau or any claim related to payment of fraudulent or inflated healthcare claims. AC ¶¶ 32-33. Those cases instead concerned BCBSM's collection of allegedly undisclosed administrative fees—not payment of medical claims—under BCBSM's form Administrative Services Contract ("ASC"). Following the Sixth Circuit's decision in *Hi-Lex*, other groups (including Comau) filed claims to recover similar fees collected under the form ASC, and BCBSM has worked to resolve these claims consistent with the court's rulings. *See* AC ¶ 35. These paragraphs involve litigation that has long since concluded, which turned on facts unrelated to the payment of fraudulent medical claims. They have no bearing on this case.

*The Wegner Allegations.*[4] The AC then turns to additional unrelated allegations, this time concerning alleged payments made by BCBSM for *other* customers—not the Plan. In a whistleblower complaint that was recently dismissed for failure to arbitrate,[5] a former BCBSM account manager named Dennis Wegner alleged that "a customer" alerted BCBSM to "a significant medical claim." AC, Ex. C ¶ 7. Wegner then researched the claim and allegedly "discovered that a medical provider was . . . overcharging significantly for routine medical testing." *Id.* ¶ 8. Wegner allegedly discovered "similar issues" with "two of his other customers," *id.* ¶ 14. When he brought these issues to BCBSM's attention, he was allegedly told "to

---

[4] The Wegner allegations are discussed here because Wegner's complaint is attached as an exhibit to the AC, but the Court should not consider them in deciding this motion. Courts have long held that unproven allegations copied from other complaints cannot establish a claim for fraud and should be stricken from the pleadings. *See Bocanegra v. Stacey*, No. 10-cv-13749, 2011 WL 4448979, at *5 n.5 (E.D. Mich. Sept. 26, 2011) ("[t]he court cannot rely on the allegations in [another] complaint as evidence to support plaintiff's claims" because the "allegations are hearsay"); *accord In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking allegations because there is "no authority that stands for the proposition that an attorney may rely *entirely* on another complaint as the *sole* basis for his or her allegations").

[5] *See* Register of Actions, *Wegner v. Blue Cross Blue Shield of Mich.*, No. 19-001808-DC (Wayne Cty. Cir. Court, Mich.) (attached to the Carlson Decl. as Ex. 3); *see also Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) ("Federal courts may take judicial notice of proceedings in other courts of record"). Wegner has since filed an arbitration demand with the American Arbitration Association.

cease researching into the issues" and "to 'stand down.'" *Id*. ¶ 15. Both Comau's original complaint and the AC try to tie the allegations in Wegner's now-dismissed whistleblower complaint to this matter by alleging that "Mr. Wegner ha[d] confirmed that Comau was a victim of BCBSM's payment of fraudulent and improper claims as well." Compl. ¶ 52; *id*. ¶ 60 ("[a]s confirmed by Mr. Wegner, BCBSM has paid many such claims using Comau's Plan's Assets"); *see also* AC ¶¶ 62-63.

The AC includes a handful of additional allegations related to the Wegner complaint to try to fill the gaps BCBSM identified in the original complaint. But, critically, the AC still does not identify a single fraudulent payment that BCBSM made on the Plan's behalf. Instead, the AC alleges that BCBSM uses the "same technology and software to process, bill, and pay all client healthcare claims," so Comau was vulnerable to the "same system failures that gave rise to other overpayment[s]" identified in the Wegner complaint. AC ¶¶ 56-58. The AC then asserts—without any supporting allegations of fact—that "Mr. Wegner has confirmed to Comau . . . that Comau was overcharged by BCBSM" and "BCBSM has paid many improper claims using Comau's Plan's Assets." AC ¶¶ 62-63.

Based on these allegations, the AC asserts that BCBSM has breached its fiduciary duties under ERISA by: (1) "[i]ntentionally and knowingly paying grossly inflated and knowingly inflated healthcare claims"; (2) "[f]ailing to exercise the care,

skill, prudence, and diligence under the circumstances that a prudent fiduciary acting in a like capacity and familiar with such matters would use in paying for healthcare claims"; and (3) "[f]ailing to correct/update its Billing System to avoid Plan assets being used to pay improper charges and concealing from, and otherwise failing to disclose to, Plaintiff the payment of improper claims." AC ¶ 94(a)-(c). Comau seeks an accounting, a declaration, restitution, and money damages. *Id.*, Prayer for Relief.

**ARGUMENT**

A motion to dismiss for failure to state a claim is an "important mechanism for weeding out meritless [ERISA] claims," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014), because "the prospect of discovery in a suit claiming breach of fiduciary duty . . . potentially expos[es] the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *St. Vincent*, 712 F.3d at 719. "This burden . . . elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." *Id.* A motion to dismiss therefore "requires careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Dudenhoeffer*, 573 U.S. at 425. The AC cannot withstand this "careful" judicial scrutiny.

## I.      **The AC Fails To Allege Fraud With Particularity.**

The AC alleges that BCBSM has a "practice" of knowingly paying fraudulent healthcare claims that caused Plan assets to be used to pay improper charges and "concealing" its behavior from Comau. As set forth here, Comau's breach of fiduciary duty claim is premised entirely on allegations of purported fraud. Accordingly, the AC is subject to Rule 9(b)'s heightened pleading standard. Thus, to avoid dismissal, the AC must "allege the time, place, and content of the alleged misrepresentation," the "fraudulent scheme," the "fraudulent intent of the defendants," and the "injury resulting from the fraud." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012) (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)) (attached to the Carlson Decl. as Ex. 4). In other words, the AC must plead "the who, what, when, where, and how" of the fraud. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). But the AC falls far short of alleging "with particularity" the circumstances of BCBSM's allegedly fraudulent conduct. Accordingly, the AC should be dismissed.

### A.      **Rule 9(b) Governs Comau's Claim.**

The overarching purpose of Rule 9(b) is to provide defendants with protection against "spurious charges of immoral or fraudulent behavior," *Bledsoe*, 501 F.3d at 510, and "fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements," *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997). Rule

9(b) accomplishes these purposes by "ensur[ing] that a defendant possesses sufficient information to respond to an allegation of fraud." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) ("*SNAPP I*"). These important policy considerations require courts to apply Rule 9(b) to all claims that are premised on fraudulent conduct—regardless of label. *See In re Gen. Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *15 (E.D. Mich. Apr. 6, 2006) (attached to the Carlson Decl. as Ex. 5). Although the AC has now replaced the word "fraud" in several instances with the word "improper," this wording change does not undo the fact that Comau's theory of breach sounds in fraud. The AC must therefore meet Rule 9(b)'s heightened pleading standard.

The Sixth Circuit, this Court, and courts around the country have held that where "the primary theory of liability contained in plaintiffs' fiduciary-duty claim [under ERISA] . . . sound[s] in fraud," *Cataldo*, 676 F.3d at 551, "the pleading of that claim *as a whole* must satisfy the particularity requirement of Rule 9(b)," *Hennigan v. Gen. Elec. Co.*, No. 09-11912, 2010 WL 3905770, at *14 (E.D. Mich. Sept. 29, 2010) (emphasis added); *see Cataldo*, 676 F.3d at 551-52 (holding that ERISA plaintiff failed to satisfy Rule 9(b) pleading requirements where "the primary theory of liability contained in plaintiffs' fiduciary-duty claims . . . sound[ed] in fraud").[6] A claim "sounds in fraud," even "where fraud is not a necessary element

---

[6] *See also Vigeant v. Meek*, 352 F. Supp. 3d 890, 896 (D. Minn. 2018) (dismissing

of a claim," *Hennigan*, 2010 WL 3905770, at *14, and even if the "allegations do not employ the word 'fraud.'" *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 785 (E.D. Mo. 2010); *see also Urban v. Comcast Corp.*, Civ. A. No. 08-773, 2008 WL 4739519, at *9 (E.D. Pa. Oct. 28, 2008) (applying Rule 9(b) although the "claims do not employ the word 'fraud'"). So long as a plaintiff "choose[s] . . . to allege in the complaint that the defendant engaged in fraudulent conduct," Rule 9(b) applies. *Vess v. Ciba-Geiby Corp. U.S.A.*, 317 F.3d 1097, 1103 (9th Cir. 2003).

Here, Comau's claim for breach of fiduciary duty is "specifically premised on averments of fraud." *Calpine*, 2005 WL 3288469, at *4. The AC starts by alleging that "[t]his dispute stems from . . . [a] relationship that has been fraught with *deception* and *fraud*." AC ¶ 10 (emphasis added). Comau alleges that BCBSM's "practice of knowingly paying Providers' improper claims"—which is allegedly

ERISA claim premised on "fraud-based allegation[s]"), *appeal docketed*, No. 18-3616 (8th Cir. Dec. 10, 2018); *Chicago Dist. Council of Carpenters Welfare Fund v. Angulo*, 169 F. Supp. 2d 880, 885-86 (N.D. Ill. 2001) (dismissing ERISA claims based on allegations of "deception and misrepresentation" under Rule 9(b)); *In re Calpine Corp. ERISA Litig.*, No. C 03-1685, 2005 WL 3288469, at *4, *7 (N.D. Cal. Dec. 5, 2005) (dismissing claim under Rule 9(b) where the "sole cause of action alleged . . . is 'Breach of Fiduciary Duty,'" which was "premised on averments of fraud"); *Vivien v. Worldcom, Inc.*, No. C 02-01329, 2002 WL 31640557, at *6 (N.D. Cal. July 26, 2002) (applying Rule 9(b) to ERISA claim premised on allegations of "false, misleading, incomplete, and inaccurate disclosures").

"widespread"—is just the most recent step in BCBSM's supposed pattern of wrongful conduct. AC ¶ 70. That alleged "practice" consisted of BCBSM paying healthcare claims, which the AC alleges were "fraudulent" because they requested "payment for an incorrect amount (including overpayments and underpayments)," "payment to an ineligible provider," "payment for services not received," and "payment for noncovered services." AC ¶ 75. Moreover, Comau alleges that not only did BCBSM allegedly "willingly pay[ ] the improper [*i.e.*, fraudulent] claims anyway," it also "concealed" this allegedly improper behavior while "hold[ing] itself out as an expert in preventing *such fraud*." AC ¶¶ 40, 81, 94(b) (emphasis added). Indeed, Comau is clear that it is not alleging that BCBSM paid too much out of mere negligence, but instead that BCBSM was supposedly complicit in the purported fraudulent scheme because BCBSM allegedly "*[i]ntentionally* and *knowingly* pa[id] grossly inflated and knowingly inflated healthcare claims" and "*conceal[ed]* from" Plaintiff these payments. AC ¶ 94(a)-(b) (emphases added). All of these allegations amount to "a unified course of [allegedly] fraudulent conduct" that subject Comau's breach-of-fiduciary-duty claim to the particularity requirement of Rule 9(b). *Hennigan*, 2010 WL 3905770, at \*14.

    **B.**    **The AC Does Not Satisfy Rule 9(b)'s "Strict" Pleading Standard.**

    The AC cannot meet Rule 9(b)'s "strict" standard of stating "with particularity the circumstances constituting" BCBSM's alleged fraud. Fed. R. Civ. P. 9(b);

*Chesbrough v. VPA, P.C.*, 655 F.3d 461, 470 (6th Cir. 2011). To meet that onerous standard, Comau must plead, at a minimum, "the who, what, when, where, and how" of the fraud. *Sanderson*, 447 F.3d at 877. The AC fails to allege any of these elements, notwithstanding that Comau has "report[s]" from BCBSM and the help of a purported whistleblower with "knowledge of Comau's data at BCBSM." AC ¶¶ 63, 88. Nor does it allege what BCBSM did to "conceal" the fact that it was using anyone's money—let alone Comau's— to pay claims that it supposedly knew were improper. AC ¶ 94(b).

The primary flaw in the AC is that it does not identify *a single* fraudulent or improper claim paid on the Plan's behalf, as Rule 9(b) requires. In the context of allegedly improper or fraudulent healthcare claims, the Sixth Circuit interprets Rule 9(b) as imposing a "strict" requirement on plaintiffs to identify, at the very least, the details of "a representative" fraudulent claim, *Chesbrough*, 655 F.3d at 470, including information about the "amounts of charges," "actual dates," "policies about billing," or "copies of a single bill or payment," *Bledsoe*, 501 F.3d at 509-10. Generic averments of fraud, like those pled here, do not provide the requisite *example* of a representative fraudulent claim—they are just unsubstantiated and conclusory allegations. *See Chesbrough*, 655 F.3d at 470 ("a complaint alleging a scheme" of fraudulent claims "failed to satisfy Rule 9(b) because, although it detailed the allegedly fraudulent accounting methodology, it did not identify specific

fraudulent" claims); *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509-10 (6th Cir. 2010) ("*SNAPP II*") (a plaintiff who alleges a fraudulent scheme "must . . . include specific examples of the defendant's claims for payment that are characteristic examples illustrative of the class of all claims covered by the fraudulent scheme") (internal quotation marks omitted).

Rather than allege the details of a fraudulent claim, the AC alleges generically that "improper claims . . . are well-known in the health care industry," AC ¶ 41, and cites Wegner's unproven whistleblower complaint as support for its allegation that BCBSM has paid *other* fraudulent claims on behalf of *other* companies. *See* AC ¶¶ 49-51, 53; *id.*, Ex. C at ¶ 12.[7] Regardless of whether these allegations are true, they have *nothing to do with Comau*. And, even if they did, they could not save the AC because even these allegations leave out critical details like *who* the "providers" are that were paid, *what* medical services they were charging for and what it should have cost, *where* the providers were located, *when* the overpayments occurred, and

---

[7] The AC also points to two news reports discussing allegedly inflated claims for urinalysis, and Paragraph 39 describes a hypothetical claim based on these reports. AC ¶¶ 42-43 & Exs. A-B. These news reports have nothing to do with either BCBSM or Comau, and Comau's hypothetical does not allege "with particularity" an actual improper claim. Among other things, the hypothetical claim does not allege the identity of any "provider" submitting an improper claim, where the provider was located, when any alleged payment occurred, or how much any claim was for.

*how* these allegedly improper claims were "concealed." *See Sanderson*, 447 F.3d at 877 (requiring that *all* these details be pled).

Comau's new allegation that "the very same system failures that gave rise to other overpayments also subjected Comau to the very same issues" is no substitute for pleading the specifics of an actual fraudulent claim. AC ¶ 58. It is well-established that Rule 9(b) requires plaintiffs to do more than plead "the basic framework, procedures, the nature of [the] fraudulent scheme, and the financial arrangements and inducements among the parties." *Bledsoe*, 501 F.3d at 504 n.13; *see also id*. at 505 (rejecting argument that Rule 9(b) could be satisfied by "plead[ing] a *false scheme* with particularity"); *U.S. ex rel. Hockenberry v. Ohio Health Corp.*, No. 2:15-CV-666, 2016 WL 4480350, at *6 (S.D. Ohio Aug. 25, 2016) (rejecting argument that "a general summary of something one might see in patient files" satisfied Rule 9(b)), *aff'd*, 2017 WL 4312016 (6th Cir. Apr. 14, 2017). Rather, Rule 9(b) demands—as an "indispensable element"—that a complaint plead "an actual false claim with particularity," "specifying the time, place, and content of [the alleged fraudulent] acts and the identity of the actors." *Bledsoe*, 501 F.3d at 510 (quoting *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)). Comau's generic allegation of "system failures" not only fails to allege the specifics of any fraudulent claim, but also fails to allege any facts about how BCBSM's "system" works, much less how it "failed."

Because it gives no details about any fraudulent claim, the AC fails to provide the notice that is necessary for BCBSM to prepare a defense. *See SNAPP I*, 532 F.3d at 504 ("Rule 9(b)'s overarching purpose is to ensure that a defendant possesses sufficient information to respond to an allegation of fraud"). And because Comau does not identify a single allegedly improper payment made on behalf of the Plan, BCBSM cannot evaluate the circumstances of any such claim to assess whether it was proper. While Comau alleges that Wegner "found similar overpayments" involving other BCBSM customers, AC ¶ 53, the AC does not provide any detail that would allow BCBSM to evaluate whether those claims were improper—much less whether they were, in fact, "similar" to any other purported overpayments alleged in the AC and whether the nature of those payments suggests anything about payments made on behalf of the Plan.

The complete lack of detail in the AC undermines Rule 9(b), which exists to "discourage[] 'fishing expeditions and strike suits' which appear more likely to consume a defendant's resources than to reveal evidences of wrongdoing." *SNAPP I*, 532 F.3d at 504. When a plaintiff complies with Rule 9(b), then "the defendant is informed of which of its specific actions allegedly constitute fraud" and "can limit discovery and subsequent litigation to matters relevant to those allegations." *Id.* The AC does not do that; it does just the opposite. It sketches the general contours of a fraud scheme that did not involve Comau, asserts that the "same" unidentified

"system failures that gave rise to other overpayment[s]," AC ¶ 58, made Comau vulnerable to similar overpayments, conclusorily alleges that "Comau was overcharged by BCBSM" as well, AC ¶ 62, and leaves BCBSM entirely clueless as to which of the many payments BCBSM has made on behalf of the Plan over the parties' decades-long relationship are disputed.

In sum, the breach of fiduciary duty claim alleged in the AC must satisfy the heightened pleading standard of Rule 9(b). The AC falls short of meeting that standard because it does not provide any factual support that suggests BCBSM ever "knowingly" paid a fraudulent healthcare claim using Plan assets. Accordingly, the Court should dismiss the AC for failure to satisfy Rule 9(b).

### C.  At A Minimum, The Court Must Disregard The Allegations Of Fraud That Are Inadequately Pled Under Rule 9(b), Which Is Also Fatal To The AC.

Even if this Court determines that the AC as a whole is not subject to Rule 9(b)'s heightened pleading standard, its allegations of fraud (now substituted with the words "improper" or "inflated," which the AC defines as "fraudulent" (¶ 75)) still must be pled with particularity. *See* AC ¶¶ 38, 40, 50-53, 55-56, 59, 60, 63-64, 71-75. Rule 9(b)'s heightened pleading standard applies to all *allegations* of fraud, "regardless of the cause of action in which they appear" and "regardless of whether fraud is an essential element of" a claim. *In re Gen. Motors ERISA Litig.*, 2006 WL 897444, at *15. Because the AC contains numerous allegations of "improper" or

"inflated"—i.e., "fraudulent"—healthcare claims that are "insufficiently pled under Rule 9(b)," the Court "must strip those averments from the claim and examine the remaining allegations to determine whether they state a claim." *Id*. Without these allegations, the AC can hardly be deemed to allege wrongful conduct at all and must be dismissed.

## II.   <u>The AC Fails To State A Claim For Breach Of Fiduciary Duty</u>.

The AC equally fails to state a claim under the pleading requirements of Rule 8(a). To survive a motion to dismiss for failure to state a claim, the AC must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. Dismissal is appropriate unless the factual allegations in the complaint are "suggestive of, rather than merely consistent with, a finding of misconduct." *Pension Ben. Guar. Corp.*, 712 F.3d at 719. The AC does not contain sufficient factual allegations to state a plausible claim that BCBSM acted imprudently.

ERISA requires plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B); AC ¶ 94(b). Whether a complaint states a claim for a breach of this duty of prudence "turns on the circumstances prevailing at the time the fiduciary acts," and requires courts to conduct a "careful, context-sensitive scrutiny of a complaint's allegations." *Dudenhoeffer*, 573 U.S at 425 (quotation marks and alterations omitted). A reviewing court must ensure that a complaint asserting a breach of the ERISA duty

of prudence "alleges *nonconclusory* factual content raising a *plausible* inference of misconduct and does not rely on the vantage point of hindsight." *St. Vincent*, 712 F.3d at 718 (internal quotation marks omitted). A complaint can withstand this "careful" scrutiny only if it "directly addresses the process by which the Plan was managed" or "if the court . . . may reasonably infer from what is alleged that the process was flawed." *Id.*

The AC cannot meet this requirement. The only facts alleged in the AC are those borrowed from *Wegner's* unproven whistleblower complaint as to what purportedly happened between BCBSM and three *other* BCBSM customers. According to the AC's repetition of Wegner's allegations, a provider fraudulently billed some other unidentified BCBSM customer too much for "routine medical testing," and BCBSM paid the claim. AC ¶¶ 49-50. The AC then tries to tie these overpayments to Comau by alleging that BCBSM uses "the same technology and software to process, bill, and pay all client healthcare claims." AC ¶ 56. But a bare allegation that BCBSM uses the same claims-processing software for all its customers—without any allegations about how the software functions or how a prudent claims-processing system would function—does not support an inference that BCBSM acted imprudently. ERISA's duty of prudence "focus[es] on a fiduciary's conduct in arriving at a . . . decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods." *St. Vincent*, 512 F.3d at 716. Under

this standard, Comau must do more than allege that BCBSM's claims-processing system failed in preventing payment of *all* improper healthcare claims. *See DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (holding that "the ultimate outcome of a [decision] is not proof of imprudence" and that an ERISA fiduciary was not "imprudent merely because [a plan investment] lost money"); *St. Vincent*, 512 F.3d at 716 (courts "cannot rely, after the fact, on the magnitude of the decrease in the [plan investment's] price" as evidence of imprudence). It must instead allege facts sufficient to plausibly establish that a *prudent* fiduciary would have prevented such overpayments—but Comau's conclusory and bare-bones assertions do not come close to meeting that standard.

Further still, Comau's bare allegation about BCBSM's software does not support an inference that any overpayments were made from Comau's Plan assets. Comau does not allege any facts suggesting that any participant in Comau's Plan ever visited any "fraudulent" provider, that any fraudulent provider submitted an "inflated" claim for care provided to a Comau Plan participant, or that BCBSM's claims-processing system paid such a claim using Comau Plan assets. That BCBSM's claims-processing system allegedly resulted in overpayments on behalf of a few other customers may make it *possible* that providers submitted improper claims to BCBSM for payment from Comau's Plan assets and that BCBSM's claims-processing system paid such claims, but it does not "nudge[] [Comau's] claims

22

across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The absence of any facts in the AC concerning how BCBSM's claims-processing system functions or how it worked in Comau's case is particularly striking here because, unlike in many ERISA cases, "extensive information regarding [BCBSM's] methods and actual knowledge" are not in the sole possession of BCBSM. *Cf. Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). The AC suggests that Comau has the cooperation of Wegner, who allegedly: (i) "had access to BCBSM's healthcare claims processing system"; (ii) "had access to all of Comau's records"; and (iii) has "personal knowledge of BCBSM's records." AC ¶¶ 48, 61-62. Nonetheless, despite its access to information, Comau fails to allege *how* the claims process works or *why* that process is imprudent "under the circumstances then prevailing that a prudent man . . . would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Instead, it alleges facts that are (at best) "consistent with" Comau's theory of imprudence, but are also "just as much in line with" a prudent process for detecting such payments. *Twombly*, 550 U.S. at 555. Conceivability is not enough to survive dismissal under *Twombly*.

Indeed, what little information there is in the AC about BCBSM's claims-processing system undercuts Comau's claim. Documents attached to the AC indicate that BCBSM uses advanced web-based software to identify "abnormal billing

patterns by doctors and facilities," and "find[] higher-than-normal prescription drug purchases by members," and that BCBSM has a unit of highly trained investigators whose sole mission is to prevent, identify, and prosecute healthcare fraud, AC ¶ 82, which has "launch[ed] a number of fraud investigations that resulted in criminal prosecutions and arrest warrants." AC, Ex. F. The AC further suggests that these safeguards are effective—BCBSM has recovered approximately $333 million. AC ¶ 83. That Comau (via Wegner) alleges these safeguards were overcome in a handful of isolated incidents unrelated to Comau, does not make it "plausible" that Comau incurred similar overpayments or that its process for paying claims is in any way imprudent. Therefore, the Court should dismiss the AC pursuant to Rule 12(b)(6) for failure to state a claim.

## III. The Claims Based On Payments Made More Than Six Years Before The Filing Of This Action Are Untimely.

Comau appears to assert claims based on payments BCBSM made dating back to 1997, AC ¶ 38, but at a minimum the AC must be limited to payments BCBSM made within six years of the filing of this action. Under ERISA, Comau's breach of fiduciary duty claim as alleged in the AC is subject to a six years statute of limitations that runs from "the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1)(A).[8] Comau asserts that BCBSM breached

---

[8] Although there is an exception to the six-year limitations period for "fraud or concealment," *see* 29 U.S.C. § 1113(2), it does not apply here because Comau has

its fiduciary duties to the Plan by "knowingly paying improper claims" from healthcare providers. *See, e.g.*, AC ¶ 70. Accordingly, the "last action which constituted a part of the breach or violation," 29 U.S.C. § 1113(1)(A), was BCBSM's alleged use of the Plan's assets to pay these allegedly improper claims. Therefore, at a minimum any claims that rely on BCBSM's payment of claims from 1997 to September 6, 2013 are untimely and should be dismissed.

## CONCLUSION

For these reasons, BCBSM respectfully asks this Court to dismiss the AC with prejudice. Faced with BCBSM's arguments for dismissal, Comau took advantage of the opportunity granted by this Court to amend its complaint—yet the AC still fails to plead facts sufficient to state a claim under any standard, and no further opportunity to amend need be granted. If the Court decides that any part of the AC can go forward, it should dismiss Comau's claim to the extent it relies on payments BCBSM made before September 6, 2013.

Dated: January 15, 2020    Respectfully submitted,

/s/Kathleen L. Carlson

G. Christopher Bernard (P57939)   Thomas D. Cunningham
Maria L. Martinez (P78790)   Tacy F. Flint
Blue Cross Blue Shield of Michigan   Kathleen L. Carlson
600 East Lafayette Boulevard   Benjamin I. Friedman
Detroit, MI 48226   Sidley Austin LLP

not alleged a fraudulent concealment with particularity, as required by Rule 9(b). *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994).

Telephone: (313) 225-6541
CBernard@bcbsm.com
MMartinez3@bcbsm.com

One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000

tcunningham@sidley.com
tflint@sidley.com
kathleen.carlson@sidley.com
benjamin.friedman@sidley.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2020, I caused true and correct copies of the foregoing to be served via the Court's CM/ECF system upon all counsel of record.

/s/ Kathleen L. Carlson
Kathleen L. Carlson